# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ANA GABRIELA GARCIA DIAZ, <br> a.k.a. ANTON GARCIA DIAZ, <br><br> Petitioner, <br><br> vs. <br><br> DAMON ACUFF, in his capacity as <br> Warden, Pulaski County Detention Center, <br><br> ROBERT GUADIAN, in his official capacity <br> as Acting Field Office Director, Chicago <br> Field Office, U.S. Immigration and Customs <br> Enforcement, <br><br> TONY H. PHAM, in his official <br> capacity as Senior Official Performing the <br> Duties of Director of U.S. Immigration and <br> Customs Enforcement, <br><br> and <br> CHAD WOLF, in his official capacity as <br> Acting Secretary of the U.S. Department of <br> Homeland Security, <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 20-cv-1112-SMY |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Petitioner Ana Gabriela Garcia Diaz, a transgender man also known as Anton Garcia Diaz,[1] is currently in immigration detention at the Pulaski County Detention Center in Ullin, Illinois ("Pulaski"). He filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Complaint for Injunctive Relief, seeking immediate release on the grounds that his prolonged detention violates his right to procedural due process and that the conditions of his confinement

---

[1] Petitioner is referred to herein with male pronouns.

1

violate his substantive due process rights. (Doc. 1).[2]

The Court has reviewed and considered the parties' briefs and supplementary documentation. For the following reasons, Garcia Diaz's request for habeas corpus relief and immediate release is **GRANTED**.

## Background

Garcia Diaz, a 31-year-old native of Honduras, entered the United States without inspection in 2008 and was removed in April 2008 pursuant to 8 U.S.C. § 1225(b)(1). (Doc. 11, p. 4). When he again returned to the U.S. without inspection, immigration authorities took steps to deport him by reinstating the April 7, 2008 expedited-removal order. *Id.* Garcia Diaz claimed he feared returning to Honduras, but an asylum officer concluded he did not have a reasonable fear of persecution or torture. That determination was affirmed by an immigration judge and Garcia Diaz was removed from the U.S. for a second time on August 5, 2009.

Garcia Diaz re-entered the U.S. again in 2014 and has resided in Wisconsin since then. (Doc. 1, p. 5). Following an arrest on September 26, 2019, he was taken into custody by Immigration and Customs Enforcement ("ICE") and remains detained.[3] (Doc. 1, p. 5; Doc. 11, p. 4). His case was processed as a "reinstatement of removal" (Doc. 11, p. 5) and he applied for withholding of removal and protection under the Convention Against Torture ("CAT") on account of his LGBTQ identification and his fear of serious harm or death if he were to return to Honduras.

---

[2] Garcia Diaz' previous request for habeas relief was denied by this Court. *Garcia Diaz v. Acuff*, Case No. 20-cv-352-SMY (S.D. Ill. May 28, 2020). The denial was without prejudice to him filing a future habeas corpus action if the length and/or circumstances of his detention were to substantially change.

[3] Garcia Diaz states the 2019 arrest was for theft and he was ticketed for possession of marijuana. (Doc. 1, p. 5). Respondents state he was arrested for resisting or obstructing an officer. (Doc. 11, p. 4). On January 15, 2016, Garcia Diaz was convicted of a civil violation for disorderly conduct in Lafayette County, Wisconsin, and on December 21, 2018, he incurred a civil forfeiture fine for resisting or obstructing an officer, also in Lafayette County, Wisconsin. (Doc. 11, p. 4; *see* Doc. 9-1, ¶ 13; Doc. 21, p. 4 in Case No. 20-352-SMY).

An immigration judge found Garcia Diaz' account of his fears to be credible and corroborated but denied his request for relief on February 10, 2020. (Doc. 1, pp. 5-6; Doc. 11, p. 5; Doc. 26-3, pp. 3, 8 in No. 20-352-SMY). Garcia Diaz appealed the ruling in March 2020; briefing before the Board of Immigration Appeals ("BIA") was completed as of May 29, 2020. On July 6, 2020, Garcia Diaz filed a motion for remand with the BIA which included new corroborating evidence regarding his gender identity, medical evaluation, and his attempts to secure hormone replacement therapy ("HRT").[4] (Doc. 1, pp. 6, 22-23; Doc. 11, p. 5; Doc. 11-1, pp. 1-2). Both matters remain pending before the BIA. ICE cannot proceed with Garcia Diaz' removal while his appeal remains pending. The agency has conducted 3 detention reviews (on May 26, July 22, and October 14, 2020) which resulted in decisions to continue Garcia Diaz' detention. (Doc. 11, p. 6; Doc. 11-1, p. 2).

Garcia Diaz arrived at Pulaski on March 13, 2020 and was placed in the female housing unit which contained 12 two-person cells. As of May 2020, he was housed alone in a cell and only 4 other detainees were housed in the unit. No female detainees had shown symptoms or tested positive for COVID-19 up to that point. (Doc. 26-1, pp. 2, 4, in Case No. 20-352).

Garcia Diaz was subsequently moved to a single two-person cell with two female detainees in Pulaski's intake/booking area where he was exposed to new detainees being held in neighboring intake cells while awaiting COVID test results. (Doc. 1, p. 10-11; Doc. 1-1, pp. 4-5). He and his cellmates were unable to maintain social distancing in this small space. They were usually required to eat meals in the cell and had limited access to out-of-cell recreation and showers.[5] (Doc. 1, pp. 10-13; Doc. 1-1, pp. 5, 7). After approximately a month, Garcia Diaz was moved to isolation for

---

[4] After many months of requesting HRT, Garcia Diaz was allowed to begin that treatment in September 2020. (Doc. 1, pp. 7-8; Doc. 1-1, p. 7; Doc. 11, p. 9; Doc. 11-1, p. 2).

[5] Respondents dispute Garcia Diaz' allegations regarding out-of-cell recreation and maintain he was offered 4 hours of recreation time daily while housed in the intake cell. (Doc. 11, pp. 7-8; Doc. 11-2, p. 3).

about a week.

On October 6, 2020, Garcia Diaz was moved back to a cell in the intake area with no cellmates. (Doc. 1-1, p. 5). Two other detainees were placed in the intake cell with him on November 12, 2020 and on November 16, 2020, he was moved from intake to D-pod along with the female detainees and now shares a cell with one other person. D-pod contains 12 two-person cells and detainees have access to a day room. (Doc. 16).

Since April 2020, confirmed COVID-19 cases at Pulaski have continued to rise, with a cumulative total of 81 positive cases recorded as of October 18, 2020 and 11 active infections on that date. (Doc. 1, pp. 3, 9).[6] The facility continues to receive new ICE detainees as well as county arrestees and prisoners in federal custody. (Doc. 11-2, p. 1).[7]

## Discussion

Garcia Diaz argues that his ongoing detention violates his Fifth Amendment right to be free from restraints on his liberty without procedural due process as he has not been afforded a bond hearing and the government has not demonstrated a "legitimate nonpunitive governmental purpose" for continuing his detention based on either a risk of flight or danger to the community. (Doc. 1, pp. 18-23). Respondents assert that his detention is governed by 8 U.S.C. § 1231 because his prior "administratively final removal order" was reinstated, and under § 1231(a)(1)(A) and (a)(2), his detention is mandatory. (Doc. 11, pp. 1-2, 10-11). They further argue that his continuing detention is authorized because he has appealed the immigration judge's order to the BIA and

---

[6] See, *ICE Guidance on COVID-19: COVID-19 ICE Detainee Statistics by Facility*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus. As of December 8, 2020, the cumulative number of positive COVID-19 cases among ICE detainees at Pulaski had risen to 100 and 1 individual with a current confirmed case was under isolation or monitoring. *Id.* (last visited December 10, 2020).

[7] Pulaski has the capacity to house over 200 ICE detainees; as of October 30, 2020, there were 65 ICE detainees in custody. (Doc. 11, p. 7; Doc. 11-2, p. 3).

4

sought remand, and his previous illegal entries to the U.S. support a conclusion that he is a flight risk.  (Doc. 11, pp. 11-12).[8]

Under 28 U.S.C. § 2241, a court may grant release to a person who "is in custody in violation of the Constitution or laws or treaties of the United States."  Noncitizens may challenge the fact of their civil immigration detention through a § 2241 petition, *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001), and courts may consider individualized challenges to the constitutionality of immigration detention.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 851-52; *Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) ("Our decision today on the meaning of that statutory provision [§ 1226(c)] does not foreclose as-applied challenges—that is, constitutional challenges to applications of the statute as we have now read it."); *Preiser v. Rodriguez*, 411 U.S. 475, 484, 500 (1973); *Zadvydas*, 533 U.S. 678, 687 (2001); *Vargas v. Beth*, 378 F. Supp. 3d 716, 722-23 (E.D. Wisc. 2019) (federal courts have jurisdiction over due process challenges to detention) (collecting cases).

It has long been established that detainees are entitled to procedural due process in relation to restraints on their liberty.  *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas*, 533 U.S. at 690.  At the same time, the government has a legitimate interest in protecting the community from any danger posed by a detainee and in ensuring his or her appearance at immigration proceedings.  Thus, when considering a habeas petition challenging detention, the Court must determine whether the particular detention at issue is reasonably related to one of these governmental interests – the government must justify continued civil confinement with "clear and convincing evidence" that

---

[8] Garcia Diaz again points out that there is a Circuit split on the question of whether the detention of individuals like him, who are in the midst of seeking withholding of removal, is governed instead by 8 U.S.C. § 1226(a), under which detention is discretionary, not mandatory.  The Seventh Circuit has not weighed in on this split, and the question is now pending before the Supreme Court.  *See Albence v. Guzman Chavez*, 207 L. Ed. 2d 1050 (U.S. June 15, 2020).   (Doc. 1, p. 6, n. 5; Doc. 13, pp. 1-2).  This Court previously concluded that it may decide whether Garcia Diaz' detention is unconstitutionally prolonged without resolving that split. (Doc. 27, pp. 4-5, Case No. 20-352).

the detainee is a flight risk or poses a danger to the community.  *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).  *See also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

While the ordinarily "brief" detention associated with pending removal proceedings is constitutionally permissible (*see Demore*, 538 U.S. at 528-31, observing that detention under § 1226(c) lasts for less than 90 days "in the majority of cases"), detention that becomes indefinite raises "serious constitutional concerns."  *Zadvydas*, 533 U.S. at 682 (detention longer than 6 months during attempts to execute final order of removal was presumptively unreasonable).  As the Seventh Circuit Court of Appeals has observed, "[i]t would be a considerable paradox to confer a constitutional or quasi-constitutional right to release on an alien ordered removed (*Zadvydas*) but not on one who might have a good defense to removal."  *Hussain v. Mukasey*, 510 F.3d 739, 743 (7th Cir. 2007).  Garcia Diaz, who is actively pursuing a cognizable defense to his removal, falls into the latter category.

In assessing the constitutionality of continued immigration detention, courts consider a number of relevant factors, including: the length of detention to date; whether it exceeds the time the detainee was in prison for the crime that prompted removal proceedings; the likely duration of future detention; the conditions of detention; whether civil detention is meaningfully different from punitive detention; whether delays in the removal proceedings were caused by the detainee or the government; and the likelihood that removal proceedings will be successful in light of any colorable defenses to removal.  *See Vargas v. Beth*, 378 F. Supp. 3d 716, 727 (E.D. Wisc. 2019); *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858 (D. Minn. 2019).  This analysis applies regardless of whether the source of detention is 8 U.S.C. § 1226(a) or 8 U.S.C. § 1231.

Garcia Diaz has been detained for over a year at this point and has never been sentenced to jail or prison as a result of his arrests.  Thus, his time in civil detention far exceeds his non-existent

criminal imprisonment.  While briefing has been completed in his BIA appeal, more than 4 months have elapsed without a decision on the appeal or his motion for remand.[9]  Given the backlog of cases at the BIA and the courts due to the current pandemic, his case will not likely be resolved anytime soon, despite Respondents' belief to the contrary.  His pending immigration proceedings are likely to remain unresolved for many more months, perhaps another year.  Because Garcia Diaz cannot be removed during the pendency of his withholding case, there is no significant likelihood that he will be removed in the reasonably foreseeable future.  *See Zadvydas*, 533 U.S. at 699, 701 ("once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.").  If Garcia Diaz' withholding request is denied by the BIA, his appeal to the Seventh Circuit will postpone any potential removal for many months. Further, Respondents' position that Garcia Diaz' detention is mandatory and their record of denying release each time his case has been reviewed also make it unlikely that they will release him while his immigration appeal remains pending.  His claims for withholding and CAT protection are colorable defenses to removal and appear to be supported by evidence that he would be harmed if he is returned to his native country.  And, the likelihood of his removal to a third country is slim based on the small number of such cases and the reality of the current pandemic.  (*See* Doc. 13, p. 2).

       Garcia Diaz has "caused" the delays in his removal proceedings only in the sense that he has exercised his lawful right to seek withholding from removal and review of the immigration judge's adverse decision.  He has diligently pursued his case and has not sought any continuances.

       The conditions of Garcia Diaz' detention have substantially changed since his earlier case

---

[9] Respondents confirm that as of November 18, 2020, no decision has yet been issued by the BIA.  (Doc. 16, p. 2).

and render his detention not meaningfully distinguishable from punitive detention. The number of confirmed COVID-19 cases among ICE detainees at Pulaski has grown from 29 in May 2020 to 100 as of December 8, 2020, notwithstanding Pulaski officials' mitigation efforts. Garcia Diaz has been exposed to an increased risk of COVID-19 infection while housed in the intake/booking area at Pulaski due to the close quarters with 3 people in a cell designed for two and the proximity to incoming prisoners whose health status was unknown. Although he was recently moved back to a regular housing unit, he is no longer alone in a cell where he can maintain social distancing.

There has also been a significant change in factors impacting whether Garcia Diaz poses a flight risk. After months of attempting to obtain hormone replacement therapy to assist in his transition, Garcia Diaz was able to begin that treatment in September 2020. He has also undergone psychiatric and medical evaluations resulting in a diagnosis of gender dysphoria. (Doc. 1, p. 6; Doc. 1-5). He expresses a strong interest in continuing hormone replacement therapy and in pursuing his immigration case so that he may lawfully remain in the U.S. These considerations militate against Respondents' argument that his remote history of unauthorized entries to the U.S. show him to be a flight risk. Moreover, ICE has measures at its disposal to monitor him if he is released and to ensure his appearance if the immigration proceedings were to conclude with a removal order.

Significantly, there is no serious contention or evidence that Garcia Diaz would be a danger to the community if he is released. His minor convictions resulted only in civil fines and Respondents do not claim that his arrests involved violence on his part. This Court's previous finding that he poses no danger remains unchanged. (See, Doc. 27, p. 6, n.4, in Case No. 20-352).

In light of Garcia Diaz' already lengthy detention and the likelihood that it will continue for a significant period, the risk of infection with COVID-19 at Pulaski, evidenced by the

unrelenting increase in confirmed cases among the immigration detainee population, and Garcia Diaz' inability to protect himself by social distancing in those conditions, his already lengthy detention and the likelihood that it will continue for a significant period, the Court concludes that his Fifth Amendment procedural due process rights are being violated and his immediate release is warranted.[10]  Respondents have not presented clear and convincing evidence that Garcia Diaz poses a risk of flight or danger to the community that would warrant the continuation of his detention.  Nor have they established a likelihood that they will be able to effectuate his removal from the U.S. in the reasonably foreseeable future.

## Disposition

The Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Complaint for Injunctive Relief (Doc. 1) is **GRANTED**.  Respondents are **ORDERED to IMMEDIATELY RELEASE** Ana Gabriela (Anton) Garcia Diaz pursuant to the following conditions:

1. Petitioner will reside at a certain residence, will provide his address and telephone contact information to Respondents, and will quarantine there for at least the first 14 days of his release;

2. Petitioner will comply with national, state, and local guidance regarding staying at home, sheltering in place, and social distancing;

3. The Court's order for release from detention may be revoked and Petitioner may be re-detained should Petitioner fail to comply with this order of release or with any condition of release set by the Department of Homeland Security

---

[10] The continuing increase in COVID-19 infections at Pulaski in recent months raises the concern that Garcia Diaz, once he is released, may present a risk of COVID-19 infection to members of the public if he must rely on public transportation to travel to his friend's residence in Chicago where he plans to stay. ICE facilities are required to consider the safety of the community as well as the detained person when release takes place. (See, Doc. 13, p. 5; referencing the 2011 Performance-Based National Detention Standards ("PBNDS") governing ICE facilities). The 2011 PBNDS sets forth standards for detention facilities such as Pulaski, and state that "release from a facility shall be consistent with safety considerations and shall take into account special vulnerabilities…. Facilities that are not within a reasonable walking distance of … public transportation shall transport detainees to local bus/train/subway stations[.]" 2011 PBNDS at 58-59, found at https://tinyurl.com/y6ohtkog (last visited November 20, 2020). Accordingly, to mitigate the danger to the public, Respondents will be directed to transport Garcia Diaz to the Chicago home where he will reside upon his release.

    ("DHS")/Immigration and Customs Enforcement ("ICE");

4. This Order does not prevent Respondents from taking Petitioner back into custody should Petitioner commit any crimes that render him a threat to public safety or otherwise violate the terms of release;

5. Respondents will provide transportation for Petitioner from Pulaski County Detention Center to the home where he will reside in Chicago;

6. Petitioner will not violate any federal, state, or local laws; and

7. At the discretion of DHS and/or ICE, to enforce the above restrictions, Petitioner's whereabouts may be monitored by telephonic and/or electronic and/or GPS monitoring and/or location verification system and/or an automated identification system.

The Clerk of Court is **DIRECTED** to close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: December 14, 2020**

*s/ Staci M. Yandle*
**STACI M. YANDLE**
**United States District Judge**